LAW OFFICE OF PETER C. HSIEH
PETER C. HSIEH    3204
Davies Pacific Center
841 Bishop St., Ste. 2201
Honolulu, HI  96813
Phone: (808) 521-3336
Email: hsiehlaw808@gmail.com
*- and -*
LAW OFFICE OF MYLES S. BREINER
MYLES S. BREINER    4364
1003 Bishop Street, Suite 2150
Honolulu, HI  96813
Telephone:  (808) 526-3426
Email: myles@breinerlaw.net

Attorneys for Plaintiff
ROYNES J. DURAL II

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF HAWAI'I

| | |
|---|---|
| ROYNES J. DURAL II,<br><br>Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF HONOLULU, SHERYL SUNIA, MYRON H. TAKEMOTO, VIBIANA KEALOHA-WONG, fka VIBIANA SLUTTER, SHYLA COMBIS, fka SHYLA KALAWAIA, CHAD KALAWAIA, NATHAN SLUTTER, DOES 1-20,<br><br>Defendants. | CIV. NO. _____<br><br>COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |

<u>COMPLAINT</u>

Plaintiff  ROYNES J. DURAL II, by and through his attorneys, Peter C. Hsieh and Myles S. Breiner, for a Complaint against the above-named Defendants, alleges and avers as follows:

<u>JURISDICTION AND VENUE</u>

1.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2.    This Court has jurisdiction over Plaintiff's federal claim under 28 U.S.C. §§ 1331 and 1343 and pendant jurisdiction over Plaintiff's state claims under 28 U.S.C. § 1367.

3.    Venue is proper pursuant to 28 U.S.C. §1391(b) because Plaintiff's claims arise in this judicial district in the City and County of Honolulu, State of Hawaii.

<u>PARTIES</u>

4.    Plaintiff ROYNES J. DURAL II ("Plaintiff") is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii.

5.    Defendant CITY AND COUNTY OF HONOLULU ("City") is, and was at all relevant times herein, a municipal corporation organized under the

laws of the State of Hawaii and is, and was at all relevant times herein, liable for the acts and omissions of the Honolulu Police Department ("HPD") and the City and County of Honolulu Department of the Prosecuting Attorney ("DOPA") and their administrators and employees.

6.    Defendant SHERYL SUNIA ("Det. Sunia") is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and was at all relevant times herein employed by the City and HPD as a police detective.

7.    Defendant MYRON H. TAKEMOTO ("DPA Takemoto") is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and was at all relevant times herein employed by the City and DOPA as a deputy prosecuting attorney ("DPA").

8.    Defendant VIBIANA KEALOHA-WONG, formerly known as VIBIANA SLUTTER ("Vibiana"), is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and was at all relevant times herein the mother of Defendant Shyla Combis and at certain relevant times herein married to Defendant Chad Kalawaia.

9.    Defendant SHYLA COMBIS, formerly known as SHYLA KALAWAIA ("Shyla"), is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii, and

3

was at all relevant times herein the daughter of Defendant Vibiana Kealoha-Wong.

10.    Defendant CHAD KALAWAIA ("Chad") is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii.

11.    Defendant NATHAN SLUTTER ("Nathan") is, and was at all times relevant herein, a citizen of the United States and resident of the City and County of Honolulu, State of Hawaii.

12.    Defendants DOES 1-20 are sued herein under fictitious names for the reason that their true names, capacities and responsibilities are presently unknown to Plaintiff, but upon information and belief they are persons, entities, governmental agencies, or partnerships who were in some manner presently unknown to Plaintiff engaged in the activities alleged herein; and are in some manner responsible for the injuries and damages to Plaintiff; and are persons who conducted some activity in a negligent, wrongful, or willful manner or who failed to fulfill a duty or obligation, which action, conduct, error or omission was the proximate cause of injuries or damages to Plaintiff; or were in some manner related to the previously named Defendants engaged in the activities alleged herein. Plaintiff will seek leave to amend this Complaint when the true names and capacities of the Doe Defendants have been ascertained.

4

FACTUAL ALLEGATIONS

13.    Plaintiff joined the U.S. Navy in August 1993 intending to pursue a career in the Navy before his life came crashing down in 2002 after he was accused of a rape he did not commit.

14.    After basic training, he was transferred to Pearl Harbor Naval Station in 1994 where he was first assigned to ship duty before being assigned to base duty as a Military Police at Pearl Harbor for three years from 1998 to 2001 until he was reassigned to ship duty on board the USS Port Royal as E-5.

Vibiana, a Scorned and Vindictive Ex-Girlfriend

15.    In 1996 Plaintiff and Vibiana were just friends until they became intimate and began an affair in December 1999.

16.    Three weeks later he ended their affair after he found out that his then-girlfriend was pregnant with their first child.

17.    Vibiana was enraged by Plaintiff's decision to break up, and became bitter and scornful.

18.    The break-up led to her attempt to commit suicide by drug overdose, and Plaintiff had to rush her to the hospital.

Shyla Was Sexually Active with Multiple Men

19.    Shyla was Vibiana's minor daughter at the time.

20.    From November 1996 to November 1997, Vibiana's husband,

5

Nathan, sexually assaulted Shyla when Shyla was approximately 10 years old.

21.    Prior to July 13, 2001, Shyla already had sexual encounters with multiple men, including, but not limited to, Nathan Slutter (at least from November 1996 to November 1997), Chad Kalawaia (at least from December 2000 to March 2001), and Lambert Marquez (from February 21, 2000 to April 2000).

### Shyla Conceals Identity of Her Lover

22.    On or about July 13, 2001, when Shyla was 14 years old, Shyla asked Vibiana about recognizing the signs of pregnancy. Shyla at the time thought she was pregnant, but a pregnancy test taken after that day was negative. Vibiana Interrogates Shyla.

23.    Shyla's inquiry about symptoms of pregnancy caused Vibiana to believe that Shyla was pregnant, so she started to interrogate Shyla about her sexual history.

24.    Vibiana started naming the men she thought might have had sex with Shyla, including her own husband at the time, Nathan, Shyla's step-father.

25.    Shyla said "no" to each name.

### Vibiana Jumps to Conclusions

26.    After running through a list of names, Vibiana asked Shyla if she was having sex with Plaintiff.

27.    Shyla remained silent and did not say a word.

6

28.    Vibiana mistook Shyla's silence to mean that Plaintiff was the guy she was having sex with.

29.    Already the scorned woman she was with a vendetta to get even with Plaintiff, Vibiana jumped to conclusions and rushed to the police station with Shyla in tow to report that Plaintiff had engaged in sexual intercourse with Shyla, her underaged daughter, which was the furthest thing from the truth.

<u>Shyla Was Coached</u>

30.    On or about July 14, 2001, she took Shyla to the police station to meet with HPD Detective Gary Daniels ("Det. Daniels").

31.    On or about July 24, 2001, Det. Daniels conducted a video interview of Shyla. During the video interview, Det. Daniels asked Shyla if she knew how old she was when she allegedly began having sex with Plaintiff. Shyla responded, "No." When he asked her if she was 11, she said she did not know. When he asked if she was 12, she said she did not know. When he asked if she was 13, she said she did not know. When he asked if she was 14, which was the age of consent, she said "no, my mom said I was 13."

32.    Based on the way Shyla responded, Det. Daniels could see that Shyla had been coached, and he promptly declined the case.

<u>Vibiana Finds Overzealous Detective</u>

33.     Undeterred, Vibiana searched for another detective to take her case, and she found one in Det. Sunia, another HPD detective.

34.     On or about August 3, 2001, Vibiana met with Det. Sunia and reported to her that Plaintiff had sexually assaulted Shyla, her underaged daughter.

35.     Det. Sunia was an overzealous police detective and eagerly took the case and went after Plaintiff based solely on the unsworn statement of a vengeful ex-girlfriend without any corroborating evidence.

<u>Det. Sunia Conducts Biased, Shoddy Investigation</u>

36.     Det. Sunia at all relevant times herein was legally and ethically required to conduct a fair and impartial criminal investigation of the charges against Plaintiff in a competent and professional manner.

37.     Instead, the criminal investigation by Det. Sunia was demonstrably and verifiably biased, incomplete, and shoddy.

<u>Det. Sunia Foregoes DNA Evidence</u>

38.     First, Shyla reportedly told Det. Sunia that she had sex with Plaintiff on the couch and that Plaintiff's semen stain was on the couch.

39.     However, at no time throughout her entire criminal investigation did Det. Sunia instruct a police evidence technician to collect a sample of the semen stain from that couch and have it tested by crime lab for DNA evidence, and then

8

obtain a DNA sample from Plaintiff for comparison to determine whether the semen stain came from the Plaintiff.

40.    Det. Sunia did not bother to collect, test, and/or preserve the alleged semen stain for DNA evidence because she knew irrefutably that the alleged semen did not belong to the Plaintiff.

41.    Det. Sunia knew or had reason to know that the DNA test result of the alleged semen stain would have proven Plaintiff's innocence and therefore the DNA test result would have constituted material exculpatory evidence in the government's possession, which the prosecutors would be required to disclose to Plaintiff's criminal defense attorneys, pursuant to the Brady Rule under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

42.    Det. Sunia failed, neglected, and/or refused to collect, test, and preserve the alleged semen stain for DNA evidence because that evidence would have proven Plaintiff's innocence and undermine, if not completely destroy, her investigation of the Plaintiff.

<u>Det. Sunia Fails To Preserve Plaintiff's Taped Interview</u>

43.    Second, Det. Sunia had conducted a tape-recorded interview of Plaintiff, which contained material information favorable to the Plaintiff which reasonably would have proven Plaintiff's innocence at his trial.

## Det. Sunia Tampers With Chad's Taped Interview

44.    Third, Det. Sunia disrupted, interfered, tampered, and/or manipulated the tape-recorded interview she conducted of Chad by stopping the recording after he started to admit to having sexual contact with Shyla, and kept it off for several minutes, and then turning it back on and moving on to other subjects before concluding the interview with Chad.

45.    Det. Sunia turned off the recording to stop Chad from further incriminating himself because she was targeting the Plaintiff.

46.    Det. Sunia could have and should have obtained a full confession from Chad about sexually assaulting Shyla.

47.    Det. Sunia's refusal to investigate Chad was improper and unethical.

48.    Det. Sunia knew or had reason to know that a full confession by Chad of his sexual assault of Shyla would have proven Plaintiff's innocence and therefore would have constituted material exculpatory evidence in the government's possession, which the prosecutors would be required to disclose to Plaintiff's criminal defense attorneys, pursuant to the Brady Rule under *Brady* and *Bagle.*

49.    Det. Sunia cut off the tape-recorded interview of Chad and chose not to question Chad further about his sexual assault of Shyla because she was

10

targeting Plaintiff and she knew that Chad's confession would prove Plaintiff's innocence and undermine, if not completely destroy, her investigation against Plaintiff.

The City Fails to Train and Supervise Det. Sunia

50.    The City, by and through the HPD, at all relevant times herein knew or reasonably should have known that Det. Sunia was a biased, sloppy, and incompetent police detective.

51.    The City, by and through the HPD, at all relevant times herein owed a duty of care to train Det. Sunia to be a competent and ethical police detective.

52.    The City, by and through the HPD, at all relevant times herein also owed a duty of care to supervise and monitor Det. Sunia to ensure that she performed her duties as a police detective in a competent and ethical manner and in accordance with standard police policies and procedures.

53.    If the City, by and through the HPD, had properly discharged their duties, Det. Sunia would have been required to conduct a fair and impartial, unbiased, and honest investigation against Plaintiff, which would have proven Plaintiff's innocence.

54.    If the City, by and through the HPD, at all relevant times herein had properly discharged their duties, the semen DNA evidence would have been collected and tested, which would have proven Plaintiff's innocence.

55.     If City, by and through the HPD, at all relevant times herein had properly discharged their duties, the tape recorded interview of Plaintiff would have not have been "lost" and Plaintiff would have been able to present it at trial, which would have proven Plaintiff's innocence.

56.     If City, by and through the HPD, at all relevant times herein had properly discharged their duties, the tape recorded interview of Chad would not have been manipulated and Chad's admission that he had sexual contact with Shyla while she was a minor would not have been interrupted and cut off by Det. Sunia to stop Chad from further incriminating himself, which would have proven Plaintiff's innocence.

57.     If City, by and through the HPD, at all relevant times herein had properly discharged their duties, Det. Sunia would have been required to investigate Chad for sexual assault of Shyla as a minor, which would have proven Plaintiff's innocence and resulted in the charge or indictment, prosecution, and conviction of Chad for sexual assault of Shyla as a minor.

58.     If City, by and through the HPD, at all relevant times herein had properly discharged their duties, Det. Sunia would have been required to investigate Nathan for sexual assault of Shyla as a minor, which would have proven Plaintiff's innocence and resulted in the charge or indictment, prosecution, and conviction of Nathan for sexual assault of Shyla as a minor.

12

Plaintiff Wrongfully Indicted and Arrested

59.    In early November 2001, Plaintiff was deployed for seven months to the Persian Gulf in support of Operation Enduring Freedom.

60.    He was totally unaware that Vibiana had gone to the police and fabricated a case against him.

61.    During this deployment, he received a Navy and Marine Corps Achievement Medal for saving a sailor who had fallen overboard during night flight operations.

62.    By the time he returned to Oahu in May 2002, he was 27 years old, a father of three, and a decorated and respected Petty Officer 2nd Class with a promising career in the United States Navy.

63.    On or about December 20, 2002, the City, by and through the DOPA, obtained a grand jury indictment against Plaintiff on one count of Sexual Assault in the First Degree and four counts of Sexual Assault in the Third Degree in the Circuit Court of the First Circuit, State of Hawaii, based upon false and perjured testimony falsely accusing Plaintiff of sexually assaulting Shyla as a minor ("Dec. 2002 Indictment").

64.    On or about January 29, 2003, Plaintiff was arrested pursuant to the Indictment.

<u>DPA Takemoto Knows Chad Sexually Assaulted Shyla</u>

65.    In early August 2002, prior to the Dec. 2002 Indictment, Vibiana and Nathan caught Chad having sex with Shyla.

66.    Chad admitted that he had been having a sexual relationship with Shyla for about two years.

67.    While preparing to testify at the Dec. 2002 grand jury proceeding, Vibiana informed DPA Takemoto that Chad had sexually assaulted Shyla as a minor.

68.    However, DPA Takemoto failed, neglected, and/or refused to investigate, charge, and/or prosecute Chad for sexually assaulting Shyla, a minor.

<u>DPA Takemoto Knows Nathan Sexually Assaulted Shyla</u>

69.    Prior to the Aug. 2003 Trial, Nathan confessed to Vibiana that he was in love with Shyla, which caused Vibiana to divorce him.

70.    After their divorce, DPA Takemoto met with both Vibiana and Nathan separately to prepare for the Aug. 2003 Trial.

71.    During preparations for the Aug. 2003 Trial, Vibiana informed DPA Takemoto that Nathan had confessed to her that he was in love with Shyla and that Nathan had taken a shower with Shyla.

72.    However, DPA Takemoto should have, but failed, neglected, and/or refused to investigate, charge, and/or prosecute Nathan for sexually assaulting

Shyla, a minor.

<u>Det. Sunia Knows Chad Sexually Assaulted Shyla</u>

73.    Prior to the Dec. 2002 Indictment, Det. Sunia knew or reasonably should have known that there was probable cause to arrest Chad for sexually assaulting Shyla, a minor; therefore, Det. Sunia owed a duty of care to Plaintiff to investigate and arrest Chad for sexual assault of Shyla.

74.    Det. Sunia breached her duty by failing, neglecting, and/or refusing to investigate and arrest Chad for sexually assaulting Shyla, a minor.

<u>Malicious Prosecution of Plaintiff</u>

75.    On August 4, 2003, Plaintiff was tried and convicted of the charges and sentenced to an open 20-year sentence ("Aug. 2003 Trial").

76.    Prior to the Aug. 2003 Trial, Det. Sunia knew or reasonably should have known that there was probable cause to arrest Nathan for sexually assaulting Shyla, a minor; therefore, Det. Sunia owed a duty of care to Plaintiff to investigate and arrest Nathan for sexual assault of Shyla.

77.    Det. Sunia breached her duty by failing, neglecting, and/or refusing to investigate and arrest Nathan for sexual assault of Shyla, a minor.

78.    Det. Sunia, at all relevant times herein, did not have probable cause to arrest Plaintiff for sexual assault of Shyla, a minor.

79.    As a direct and proximate result of Det. Sunia's wrongful

15

conduct, Plaintiff was wrongfully arrested, indicted, prosecuted, convicted, sentenced, and incarcerated for sexual assault of Shyla, a minor, which he did not commit.

80.    Plaintiff was actually and factually innocent of the crimes at issue. The true perpetrators, Chad and Nathan, were never prosecuted and convicted.

81.    DPA Takemoto wrongfully prosecuted and convicted Plaintiff despite knowing that he was innocent and that Chad and Nathan were the actual perpetrators.

82.    Prior to the Aug. 2003 Trial, DPA Takemoto owed a duty of care to Plaintiff to drop the charges against Plaintiff and charge or indict Chad instead because he knew or reasonably should have known that there was probable cause to charge or indict and prosecute Chad for sexual assault of Shyla, a minor.

83.    DPA Takemoto breached his duty by failing, neglecting, and/or refusing to charge or indict and prosecute Chad for the sexual assault of Shyla, a minor.

84.    DPA Takemoto breached his duty by failing, neglecting, and/or refusing to present evidence of Chad's sexual assault of Shyla, a minor, at the Aug. 2003 Trial, which DPA Takemoto was legally obligated to present, because the evidence was exculpatory in nature proving or tending to prove Plaintiff's innocence.

16

85.     DPA Takemoto knew or had reason to know that Chad's sexual assault of Shyla when she was a minor would have proven Plaintiff's innocence and therefore would have constituted material exculpatory evidence in the government's possession, which the prosecutors would be required to disclose to Plaintiff's criminal defense attorneys, pursuant to the Brady Rule under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

86.     Prior to the Aug. 2003 Trial, DPA Takemoto owed a duty of care to release Plaintiff and to charge or indict Nathan instead because he knew or reasonably should have known that there was probable cause to charge or indict and prosecute Nathan for sexual assault of Shyla, a minor.

87.     DPA Takemoto breached his duty by failing, neglecting, and/or refusing to charge or indict and prosecute Nathan for the sexual assault of Shyla, a minor.

88.     DPA Takemoto breached his duty by failing, neglecting, and/or refusing to present evidence of Nathan's sexual assault of Shyla, a minor, at the Aug. 2003 Trial, which DPA Takemoto was legally obligated to present, because the evidence was exculpatory in nature proving or tending to prove Plaintiff's innocence.

89.     DPA Takemoto knew or had reason to know that Nathan's sexual

17

assault of Shyla when she was a minor would have proven Plaintiff's innocence and

therefore would have constituted material exculpatory evidence in the government's

possession, which the prosecutors would be required to disclose to Plaintiff's

criminal defense attorneys, pursuant to the Brady Rule under *Brady v. Maryland*,

373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *United States v. Bagley*,

473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

90.    DPA Takemoto, at all relevant times herein, did not have

probable cause to indict, prosecute, convict, and/or incarcerate Plaintiff.

91.    As a direct and proximate result of DPA Takemoto's wrongful

conduct, Plaintiff was wrongfully indicted, prosecuted, convicted, sentenced, and

incarcerated for sexual assault of Shyla, a minor, which he did not commit.

92.    The prosecution and conviction of Plaintiff were induced by

fraud, corruption, perjury, fabricated evidence, or other wrongful conduct

undertaken in bad faith. *See, e.g.*, *Williams v. Hartford Ins. Co.*, 147 Cal. App. 3d

893, 195 Cal.Rptr. 448, 452 (Cal. Ct. App. 1983); *Rupp v. Summerfield*, 161 Cal.

App. 2d 657, 326 P.2d 912, 915-16 (Cal. Ct. App. 1958); *Murphy v. Lynn*, 118 F.3d

938, 948 (2d Cir. 1997). See also *Restatement (Second) of Torts § 663*; H. D. Warren,

Annotation, *Malicious Prosecution: Commitment, Binding Over, or Holding for*

*Trial By Examining Magistrate or Commissioner as Evidence of Probable Cause,*

*68 A.L.R.2d 1168 (1993)*; 54 C.J.S. *Malicious Prosecution § 33* (2003);

18

*2d Malicious Prosecution* § 62; W. Keeton et al., Prosser and Keeton on the Law of Torts § 119, at 881 (5th ed. 1984).

<u>Conviction Overturned Exonerating Plaintiff</u>

93.    On or about August 8, 2005, the conviction was affirmed on direct appeal by the appellate courts.

94.    On or about September 1, 2005, Plaintiff turned to the Hawaii Innocence Project ("HIP") and asked them to investigate his case and seek to overturn his criminal conviction because he was factually innocent of the crimes.

95.    On or about July 31, 2006, Plaintiff filed his first Rule 40, Hawaii Rules of Penal Procedure ("HRPP") post-conviction relief petition ("First Petition") in which Plaintiff requested a new trial

96.    The trial court denied the First Petition.

97.    On or about November 20, 2008, the Intermediate Court of Appeals ("ICA") affirmed the denial of the First Petition.

98.    On or about December 12, 2008, Plaintiff sought Hawaii Supreme Court certiorari of the ICA denial.

99.    On or about January 27, 2009, the Hawaii Supreme Court denied certiorari without prejudice.

100.    On or about May 1, 2009, Plaintiff filed a second Rule 40 Petition ("Second Petition").

19

101.   In or around December 2011, while the Second Petition was pending, Plaintiff was paroled, after serving eight years in prison.

102.   On or about April 5, 2013, the Second Petition was denied by the trial court and Plaintiff took an appeal of the denial of the Second Petition.

103.   Five years later, on or about May 9, 2018, the ICA reversed the denial of the Second Petition and vacated Plaintiff's conviction and remanded the case for a new trial based on the newly discovered evidence.

104.   The newly discovered evidence included, but was not limited to, the following:

a.   The alleged victim, Shyla, committed fraud and perjury by providing false statements to HPD prior to the Aug. 2003 Trial and perjured testimony at the Aug. 2003 Trial accusing Plaintiff of sexually abusing her;

b.   A polygraph test of Shyla, administered by a well-respected polygraph examiner, Jack Trimarco, subsequently showed that Shyla was highly deceptive and untruthful when asked whether Plaintiff sexually abused her. Shyla had believed that she was pregnant by Chad at the time and falsely accused Plaintiff to conceal her sexual relationship with her step-father Nathan, and his best friend, Chad;

c.   Shyla lied to the police and at the trial that she had sex with Plaintiff when she was 14 years old in 2001; however, she confessed in her MySpace

20

social media that she was not having sex with anyone other than her ex-husband, Chad;

       d.     Plaintiff passed the polygraph test administered by the same polygraph examiner, Jack Trimarco;

       e.     Shyla concealed her sexual relationship with Chad as she lied to HPD about Plaintiff;

       f.     Vibiana committed fraud and perjury by providing false statements to HPD and perjured testimony at trial accusing Plaintiff of sexually abusing her daughter. After the conviction, however, Vibiana filed a declaration and recanted her trial testimony, stating that Plaintiff did not sexually abuse Shyla;

       g.     Det. Sunia, who handled the investigation, intentionally refused to obtain DNA evidence from a sample of an alleged semen stain from a couch, which would have exonerated Plaintiff. Although the presence or absence of Plaintiff's semen on the couch was critical to the police investigation, Det. Sunia chose not to collect a sample for DNA testing and have the results compared to Plaintiff's DNA, which would have proved Plaintiff's innocence. When Det. Sunia was later asked why she did not test the semen for DNA comparison, she said, "the opportunity never came up." At trial, Vibiana testified that Det. Sunia never made any attempt to collect DNA samples from the couch;

       h.     Nathan, who was married to Vibiana, Shyla's mother,

admitted that he started sexually abusing Shyla since she was 10 years old, and as well as throughout the time when Shyla claimed Plaintiff was sexually abusing her;

i.    Chad, who later married then divorced Shyla, admitted that he also was sexually abusing Shyla during the alleged time period Shyla claims Plaintiff was sexually abusing her;

j.    When Vibiana informed DPA Takemoto that Shyla was having sex with other men, DPA Takemoto instructed Vibiana to tailor her trial testimony to "what they knew at the time";

k.    Vibiana told DPA Takemoto that Chad had been sleeping with Shyla for approximately two (2) years before August 2002 when she discovered Shyla utterly naked underneath a blanket with Chad, who was only in his underwear in August 2002;

l.    Despite receiving this information, DPA Takemoto refused to investigate, arrest, and prosecute Chad for sexually assaulting Shyla;

m.    Despite receiving this information, DPA Takemoto refused to investigate, arrest, and prosecute Nathan for sexually assaulting Shyla;

n.    Upon learning that Plaintiff was receiving assistance from HIP, Det. Sunia coerced, harassed, intimidated and threatened Nathan and Vibiana into silence between May and June of 2009;

o.    Chad admitted to having sex with Shyla in 2002 when she

22

was 15, during his May 2009 interview with Det. Sunia, but no charges were pursued;

p.      On or about August 15, 2002, Chad was expelled from the Waimanalo Church of Jehovah's Witnesses for his sexual relationship with an under-aged Shyla;

q.      Nathan sexually abused Shyla and her younger sister, Shayna, as early as 1997. In a Child Welfare Services report dated January 10, 2007, Shayna described Nathan's first instant of sexual abuse occurring eight to nine years prior to 2006. In addition, Nathan admitted to molesting Shayna and stated that his Church counseled him about his behavior;

r.      Nathan was also sexually abusing Shyla around the same time period as he was abusing her sister Shayna. During her polygraph with Jack Trimarco in 2009, Shyla inadvertently mentioned Nathan's abuse occurring when she was around 10 years old; and

s.      Despite numerous attempts by the State to contact Shyla to testify at the new trial, Shyla refused to commit to prosecution, refused to cooperate with the State, and refused to testify at trial.

105.   On or about September 5, 2019 the Hawaii Supreme Court denied the State's petition for *certiorari*.

106.   As a result of the denial of the certiorari, the six-month speedy

trial rule under HRPP Rule 48 began to run from September 5, 2019. Hence, the trial court set the case for trial in the week of December 2, 2019, 16 years after the first trial.

107.   The trial court found that the State made numerous attempts to contact Shyla; however, Shyla refused to assist the prosecution. Despite her refusal to assist, Shyla refused to withdraw her complaint.

108.   At the trial status conference on December 3, 2019, the State represented it was not ready to proceed to trial.

109.   The State then moved to *nolle prosequi* the charges against Plaintiff without prejudice for 30 days so that Shyla would have more time to decide if she would testify against Plaintiff at the new trial.

110.   Plaintiff opposed the State's motion and moved the trial court to dismiss the charges with prejudice.

111.   On or about January 3, 2020, the trial court denied the State's motion and granted Plaintiff's request, dismissing all charges against him with prejudice.

112.   Defendants, jointly and severally, acted with malice and committed numerous wrongful acts and omissions.

113.   In addition to Plaintiff losing his freedom during his incarceration, Plaintiff lost contact with his family, he lost, as well as his good name,

reputation, and standing in the community.

114.    After Plaintiff was convicted on or about August 4, 2003, the Navy discharged him from service and stripped him of all his rights and benefits.

115.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff was wrongfully incarcerated for eight years and thereafter being monitored as a parolee for another eight years.

116.    Plaintiff suffered extreme depression, severe emotional distress, and untold mental anguish, knowing he had been convicted for a crime he did not commit. He missed the prime of his life and an opportunity to build a promising career in the Navy. He lost his life with his children. He lost the opportunity to watch his children grow up, which he can never get back. His good name and reputation have been permanently and irreparably damaged, marred, and/or tarnished. He lost his confidence, self-respect, and dignity, which are the core of his spirit, mind, and soul.

## COUNT I
### *42 U.S.C. § 1983 – False Arrest*

117.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

118.    A claim for false arrest and imprisonment can be the basis for compensatory relief under 42 U.S.C. § 1983 as a Fourth Amendment violation when

the arrest is allegedly made without probable cause or justification. *Dubner v. City and County of San Francisco*, 266 F.3 959, 964 (9th Cir. 2001).

119.   To state a claim under § 1983 for false arrest, a plaintiff must allege facts to support a lack of probable cause for his arrest. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (citing *George v. City of Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992)).

120.   Probable cause "exists when under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the person arrested] had committed a crime." *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

121.   Plaintiff's February 3, 2003 arrest was without probable cause.

122.   Plaintiff did not have a criminal record.

123.   Vibiana and Shyla's accusations against him were not supported or corroborated by any independent and objective evidence.

124.   Vibiana was a bitter and scorned ex-girlfriend of Plaintiff and falsely accused him of sexual assault of Shyla to get back at him for breaking up with her.

125.   Shyla falsely led Vibiana to believe that Plaintiff was the man she was having sex with by remaining silent when Vibiana mentioned his name because she did not want reveal the true identity of her lovers.

26

126.   Suina intentionally chose not to conduct DNA testing of the semen stain on the couch that Shyla falsely claimed came from Plaintiff. If Det. Sunia had done that, the DNA test result would have proven Plaintiff's innocence.

127.   Plaintiff voluntarily provided a tape-recorded statement to Det. Sunia and answered all her questions truthfully and accurately, which would have proven Plaintiff's innocence. That is why Det. Sunia intentionally destroyed or discarded his tape-recorded statement.

128.   Chad admitted to Det. Sunia that he had sexual relations with Shyla as a minor, and yet Det. Sunia refused to investigate and charge Chad for sexual assault of Shyla as a minor. Det. Sunia further manipulated the tape-recorded interview of Chad to stop him from further incriminating himself.

129.   Vibiana told Det. Sunia that Nathan had sexual relations with Shyla as a minor, and yet Det. Sunia refused to investigate and charge Nathan for sexual assault of Shyla as a minor.

130.   Although Det. Sunia could have investigated and arrested both Chad and Nathan for sexual assault of Shyla as a minor, Det. Sunia chose not to arrest or prosecute them and targeted Plaintiff instead due to his race (Black) and his status as a sailor in the U.S. Navy.

131.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to

recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT II
### *42 U.S.C. § 1983 – Malicious Prosecution*

132. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

133. To prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto, 368 F.3d 1062, 1066* (9th Cir. 2004), citing *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

134. In addition, the plaintiff must establish that the prior proceedings terminated in such a manner as to indicate his innocence. *Awabdy*, 368 F. 3d at 1068 (emphasis added).

135. A plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. *See, e.g.*, *Williams v. Hartford Ins. Co.*, 147 Cal. App. 3d 893, 195 Cal.Rptr. 448, 452 (Cal.

28

Ct. App. 1983); *Rupp v. Summerfield*, 161 Cal. App. 2d 657, 326 P.2d 912, 915-16 (Cal. Ct. App. 1958); *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997). See also *Restatement (Second) of Torts § 663*; H. D. Warren, Annotation, *Malicious Prosecution: Commitment, Binding Over, or Holding for Trial By Examining Magistrate or Commissioner as Evidence of Probable Cause, 68 A.L.R.2d 1168 (1993)*; 54 C.J.S. *Malicious Prosecution § 33* (2003); *52 Am. Jur. 2d Malicious Prosecution* § 62; W. Keeton et al., Prosser and Keeton on the Law of Torts § 119, at 881 (5th ed. 1984).

136.   "[M]alicious prosecution actions are not limited to suits against prosecutors but may be brought . . . against other persons who have wrongfully caused the charges to be filed." *Awabdy*, 368 F.3d at 1062.

137.   Moreover, a "police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable for damages incurred as a proximate result of those reports." *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007).

138.   A plaintiff may assert a § 1983 claim against state or local officials, including those who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings. *See*

29

*Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002) (holding that plaintiff's allegations that a coroner's knowingly or recklessly false statements led to his arrest and prosecution were sufficient to state a § 1983 claim); *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997) (holding that a probable cause determination "that is 'tainted by the malicious actions of the government officials [involved]' does not preclude a claim against the officials involved." (quoting *Hand v. Gary*, 838 F.2d 1420, 1426 (5th Cir. 1988)). *See also 5 Witkin, Summary of Cal. Law, Torts § 418* (9th ed. 1998) ("One who procures a third person to institute a malicious prosecution is liable, just as if he instituted it himself.").

   139. In this case, Defendants prosecuted Plaintiff, or caused Plaintiff to be prosecuted, based upon fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith, including, but not limited to, the following:

    a. The false statements of fact given by Shyla and Vibiana;

    b. The perjured testimonies of Shyla and Vibiana;

    c. Det. Sunia's refusal to collect, test, and preserve the alleged semen stain on the couch for DNA evidence, which would have exonerated Plaintiff;

    d. Det. Sunia's destruction or loss of Plaintiff's recorded statement, which would have been potentially exculpatory evidence for Plaintiff at

his trial;

e.     Det. Sunia's refusal to investigate Chad and Nathan for alleged sex abuse of Shyla, which would have exonerated Plaintiff;

f.     DPA Takemoto's refusal to investigate Chad and Nathan for alleged sex abuse of Shyla, which would have resulted in a dismissal of the criminal case against Plaintiff;

g.     DPA Takemoto's refusal to allow Shyla and Vibiana to testify that Shyla was having sex with other men and not Plaintiff;

h.     DPA Takemoto's instruction to Shyla and Vibiana not to testify about Shyla's sexual relationship with other men and to merely testify according to "what they knew at the time";

i.     The State's refusal to dismiss the case even after Vibiana recanted her testimony and Chad and Nathan provided sworn statements that they were the ones who sexually abused Shyla, and not Plaintiff; and

j.     DPA Takemoto's refusal to investigate after Vibiana told the first prosecutor that Chad had been sleeping with Shyla for approximately two years before August 2002 when she discovered Shyla naked under a blanket with Chad, who was only in his underwear.

140.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to

recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT III
### *42 U.S.C. § 1983 – Wrongful Conviction and Imprisonment*

141.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

142.   To recover damages under § 1983 for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. *Heck v. Humphrey*, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

143.   The plaintiff must establish that the prior proceedings terminated in such a manner as to indicate his innocence. *Awabdy*, 368 F. 3d at 1068 (emphasis added).

144.   A claim for damages challenging a conviction or sentence that has not been so invalidated is not cognizable under § 1983. *Id.* at 487.

145.   When a state prisoner seeks damages in a § 1983 suit, the district

court must therefore consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence. If it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. *Id*.

146.   In this case, Plaintiff's conviction was vacated and the case was remanded for a new trial. When Defendants refused to proceed with a new trial, the case and all crimes that Plaintiff was charged with were dismissed with prejudice.

147.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

<u>COUNT IV</u>
*42 U.S.C. § 1983 - Municipal Liability*

148.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

149.   Local governments, such as the City and County of Honolulu, are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort. *See* Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

150.   To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: "(1) that [the plaintiff] possessed a constitutional right of which [he] was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *See Plumeau v. School Dist. #40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (citations and internal quotation marks omitted).

151.   For municipal liability, a plaintiff must plead sufficient facts regarding the specific nature of the alleged policy, custom or practice to allow the defendant to defend themselves effectively, and these facts must plausibly suggest that the plaintiff is entitled to relief. *See AE v. Cty. of Tulare*, 666 F.3d 631, 636-37 (9th Cir. 2012). It is not sufficient to merely allege that a policy, custom or practice existed or that individual officers' wrongdoing conformed to a policy, custom or practice. *See id.* at 636-38.

152.   Plaintiff was deprived of his constitutional right against unreasonable searches and seizures and unconstitutional conviction or imprisonment.

153.   The City had a "no drop" policy of initiating and maintaining criminal proceedings, taking the majority of those cases to trial, and very rarely dismissing a case, even where substantial evidence pointed to a defendant's

innocence.

154.    This policy amounts to deliberate indifference to Plaintiff's constitutional rights.

155.    This policy was the moving force behind the violation of Plaintiff's constitutional rights.

156.    As a direct and proximate Defendant City's wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

<u>COUNT V</u>
*State Law Claim – False Arrest*

157.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

158.    "For both false arrest and false imprisonment, the essential elements are (1) the detention or restraint of one against his or her own will, and (2) the unlawfulness of such detention or restraint." Reed v. City and County of Honolulu, 76 Hawai'i 219, 230, 873 P.2d 98, 109 (1994)

159.    The arrest or restraint was against Plaintiff's own will.

160.    The arrest or restraint was without probable cause or

justification.

161.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VI
*State Law Claim – Malicious Prosecution*

162.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

163.   To recover damages for malicious prosecution, a plaintiff must prove that (1) that the prior proceedings were terminated in the plaintiff's favor, (2) that the prior proceedings were initiated without probable cause, and (3) that the prior proceedings were initiated with malice. *Myers v. Cohen*, 67 Haw. 389, 391, 688 P.2d 1145, 1148 (1984); Brodie v. Hawaii Automobile Retail Gasoline Dealers Ass'n, Inc., 2 Haw. App. 316, 318, 631 P.2d 600 (1981), rev'd on other grounds 65 Haw. 598, 655 P.2d 863 (1982), citing Prosser, Law of Torts (4th ed.) § 120 at 850-56 (1971).

164.   The prior proceedings against Plaintiff terminated in his favor in that the conviction was vacated and case was subsequently dismissed with prejudice

in favor of Plaintiff.

165.   The prior proceedings were <u>initiated</u> without probable cause in that Defendants knew or reasonably should have known that (a) Plaintiff did not sexually abuse Shyla; (b) Defendants refused to test the alleged semen stain on the couch for DNA evidence, which would have exonerated Plaintiff at the outset; (c) Det. Sunia failed to conduct a proper police investigation, which would have cleared Plaintiff and implicated other men who were actually sexually abusing Shyla during the alleged time period; and (d) DPA Takemoto knew that Det. Sunia intentionally refused to test the alleged semen stain for DNA evidence, which would have exonerated Plaintiff.

166.   A plaintiff may bring an action in tort for the <u>maintenance</u> of a malicious prosecution as well as for the <u>initiation</u> of a malicious prosecution. *Arquette v. State*, 128 Haw. 423, 427, 290 P.3d 493, 497 (2012). Thus, a claim for initiation of a malicious prosecution may lie if the defendant had no probable cause to file a complaint and acted with malice. *Id.* Even if the defendant had probable cause to file a complaint, however, the defendant could be liable for the <u>maintenance</u> of a malicious prosecution if he maintained the prosecution without probable cause and acted with malice. *Id.*

167.   The prior proceedings were <u>maintained</u> without probable cause in that Defendants knew or reasonably should have known that (a) Plaintiff did not

sexually abuse Shyla; (b) Defendants refused to test the alleged semen stain on the couch for DNA evidence, which evidence would have exonerated Plaintiff at the outset; (c) Det. Sunia failed to conduct a proper police investigation, which would have cleared Plaintiff and implicated other men who were actually sexually abusing Shyla during the alleged time period; and (d) the prosecutor knew that Det. Sunia intentionally refused to test the alleged semen stain for DNA evidence, which would have exonerated Plaintiff.

168.   The prior proceedings were initiated with malice.

169.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT VII
### *State Law Claim – Wrongful Conviction or Imprisonment*

170.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

171.   The prior proceedings against Plaintiff were terminated in Plaintiff's favor, were without probable cause, and initiated with malice.

172.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

COUNT VIII
*State Law Claim – Defamation*

173.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

174.   Defendants published, and caused to be published, false and defamatory statements concerning Plaintiff.

175.   To establish a prima facie case of defamation, the plaintiff must prove four material elements:  (1) A false and defamatory statement concerning the plaintiff; (2) An unprivileged publication to a third party; (3) Fault amounting at least to negligence on the part of the publisher [actual malice where the plaintiff is a public figure]; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Dunlea v. Dappen*, 83 Haw. 28, 924 P.2d 196 (1996).

176.   Defendants made, and caused to be made, false and defamatory statements falsely accusing Plaintiff of raping Shyla.

39

177.   The alleged defamatory statements were unprivileged publications to a third party.

178.   Defendants made, and caused to be made, the unprivileged publications to a third party.

179.   Defendants made, and caused to be made, the publication knowing that the statements were false.

180.   Plaintiff is not a public figure.

181.   Defendants' fault amounts at least to negligence.

182.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT IX
### *State Law Claim – Defamation Per Se*

183.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

184.   An accusation of a crime of moral turpitude is actionable per se, *see Russell v. Am. Guild of Variety Artists*, 53 Haw. 456, 458, 497 P.2d 40, 42 (1972), *Butler v. United States*, 365 F.Supp. 1035, 1044 (D. Haw. 1973), *Kahanamoku v.*

40

*Advertiser Pub. Co.*, 25 Haw. 701, 709–10 (1920), *Pollard v. Lyon*, 91 U.S. 225, 227, 23 L.Ed. 308 (1875).

185.   Defendants published, or caused to be published, false and defamatory statements concerning Plaintiff.

186.   Defendants made, or caused to be made, an unprivileged publication to a third party.

187.   Defendants made, or caused to be made, the publication knowing that they were false.

188.   Defendants' defamatory statements impute to Plaintiff that he is a pedophile, depraved, sexual deviant, child molester, and/or child sex offender.

189.   Defendants' defamatory statements have a tendency to injury Plaintiff in his office, profession, calling, or trade.

190.   Defendants' defamatory statements hold Plaintiff up to scorn and ridicule and to feelings of contempt or execration, impair him in the enjoyment of society and injury those imperfect rights of friendly intercourse and mutual benevolence which man has with respect to man.

191.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a

trial or hearing hereof.

## COUNT X
### *State Law Claim – False Light/Invasion of Privacy*

192.  Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

193.  Defendants published false and defamatory statements concerning Plaintiff.

194.  Defendants' defamatory statements create a false light.

195.  The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

196.  Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed.

197.  As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT XI
### *State Law Claim – Negligence*

198.  Plaintiff realleges and incorporates herein the allegations

42

contained in the preceding paragraphs as though fully alleged herein.

199.    Defendants owed a duty of care to Plaintiff to protect them from foreseeable risk of harm.

200.    Defendants breached their duty to Plaintiff.

201.    Defendants' wrongful conduct caused Plaintiff to sustain damages.

202.    Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiff.

203.    As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special and general damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT XII
*State Law Claim – Gross Negligence*

204.    Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

205.    Defendants acted with reckless disregard of the need to use reasonable care, which was likely to cause foreseeable injury or harm to Plaintiff.

206.    Defendants' wrongful conduct caused Plaintiff to sustain damages.

43

207.   Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiff.

208.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

## COUNT XIII
*State Law Claim – Intentional Infliction of Emotional Distress*

209.   Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

210.   Defendants' wrongful conduct was intentional.

211.   Defendants' conduct was outrageous, beyond bounds of decency, willful and wanton, and malicious.

212.   Defendants' wrongful conduct caused Plaintiff to sustain damages.

213.   Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiff.

214.   As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to

recover special, general, compensatory, and punitive damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

COUNT XIV

*State Law Claim – Negligent Infliction of Emotional Distress*

215. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs as though fully alleged herein.

216. Defendants caused Plaintiff to suffer serious emotional distress or disturbance.

217. Defendants caused Plaintiff to suffer demonstrable physical injury and mental illness.

218. Defendants' wrongful conduct was a substantial factor in causing damage to Plaintiff.

219. As a direct and proximate Defendants' wrongful conduct, Plaintiff sustained, and continues to sustain, damages and is therefore entitled to recover special and general damages, together with reasonable attorney's fees and court costs, in such amounts as shall be shown at a trial or hearing hereof.

WHEREFORE, Plaintiff prays for Judgment in his favor and against Defendants, jointly and severally, as follows:

A. Special damages in an amount to be determined at a trial or

45

hearing hereof;

   B. General damages in an amount to be determined at a trial or hearing hereof;

   C. Compensatory damages in an amount to be determined at a trial or hearing hereof;

   D. Punitive damages against all defendants except the State and the City in an amount to be determined at a trial or hearing hereof;

   E. Reasonable attorneys' fees and costs;

   F. Pre-judgment interest and post-judgment interest; and

   G. Any and all other relief as may be deemed just and equitable by the Court.

   DATED: Honolulu, Hawaii, November 24, 2021.


      /s/ Peter C. Hsieh
      PETER C. HSIEH
      MYLES S. BREINER
      Attorneys for Plaintiff
      ROYNES J. DURAL II